Good morning, Your Honors. May it please the Court, I'm Deanna Dotson, representing the appellate Taloa Latu. I'd like to start with some facts on the video, which was the major piece of evidence that convicted Mr. Latu. If you look carefully at the video, it was four minutes and two seconds. And the time that Mr. Latu entered that education room and the time he walked out the door was approximately 22 seconds. And when he entered, he did assault Mr. Yamaguchi. But Mr. Yamaguchi either fell off the chair or slipped off the chair. And he was sitting on the floor a little to the right of the door where you could see him. And his back was to the camera. His back was to Mr. Latu. And then another inmate came and took a hold of Mr. Latu to prevent him from continuing to go after Yamaguchi. And then he turned around and he was walking out. And then he turned back and he kicked Mr. Yamaguchi. However, you have to realize the kick was really close. He has bare feet with rubber slippers on, so he's not wearing any heavy shoe that kicks him. And he most likely kicked him in the buttocks because he was sitting on the floor. And there were table legs around him, chairs around him. And he just was a quick kick to him. So once all the inmates are out and they took a lot of time to get cleaned up. They even wiped the table. They took chairs out. When they were all out of that room, Mr. Latu gets up on his own. There was no evidence that he was unconscious. He was sitting there the entire time. He gets up, turns around. He starts to walk up. He picks up his shirt and he wipes. It looks like he wipes his nose. The shirt drops down and he walks out. And you can see the shirt. His shirt is either white or very light colored. And you can see a spot that looks like blood towards the bottom of the shirt. And that's the only spot of blood anywhere. It doesn't show that he was bleeding from his mouth as was stated. It doesn't show that his jaw was broken. It doesn't show any of those injuries. And then another inmate comes along and encourages him to walk back in. And then you don't see anything from then on. Another interesting fact is all the other videos of that particular location in 6A, where these inmates were all housed, they were all purged. This is the only video that was saved. So we don't know how Mr. Gamaguchi was walking normally. Was that his normal stance the way he was walking when he was walking out of that door? We don't know what happened. But we do know over an hour later at 124, Mr. Gamaguchi made a telephone call to his auntie, a family member, and that call lasted about four minutes. And there was no evidence on that recording or in the transcripts that he had any difficulty in speaking or any problem enunciating any words any more than normal. This sounds like trial arguments, which counsel had an opportunity to present. So now we're on appeal on which every inference is drawn in the government's favor. Doesn't that make a difference? I don't think so because the jury only saw that video once. And when I got the video from the defense, it was not a very clear video. I couldn't see it. It was very halting. When they submitted it to the court, I'm grateful because I got a copy from the U.S. attorney of that video. And there I could clearly see the evidence that I can argue on appeal because I'm arguing that the facts do not support the conviction that he was convicted for a serious violent felony. And between the video and the call and the time difference, he didn't go right. If he was seriously injured and had his jaw broken and blood was coming out and he couldn't talk and he had all these injuries that he complained of later, then why didn't he go to medical immediately? But he didn't. He made the phone call, and then we don't know what happened, but he says he fell out of a bunk. We don't know if he was on the top bunk or the bottom bunk, but the floors at the FDC are cement, not concrete. So if he fell out, if he got in and maybe fell asleep or rolled over and fell, he could have been injured, the broken jaw and et cetera, the other damages that he had to his face, but they were not evident from that video. And that's very important on the appeal that those injuries were not that he did sustain, that they're calling serious injuries did not occur in that room with Mr. Latu actually punching him a couple times. They didn't occur there. You could see straight on the video, and there wasn't blood coming out. There weren't any of the things that were mentioned during sentencing that, you know, he was unconscious and he was beaten severely and blood was coming running down his face and all over. You can't see that on the video, and that is important to the appeal for me to point that out, that the conviction should not have occurred for serious violent felony because the evidence wasn't there. Also, another fact is on the confrontation cause because Mr. Yamaguchi never gave a written statement to the defense or anything that could be presented. The defense never had an opportunity to cross-examine him. The prosecution, three weeks before trial, they tried to find Mr. Yamaguchi, and they said they couldn't find him. Well, Mr. Yamaguchi has been in and out of trial, I mean in and out of court, jails, and he was on probation. The island he was on, Oahu, is a very small island, and all he had to do was really go to any of the police officers who knew him probably intimately with his various state offenses, but that didn't happen, so he was unavailable, but it didn't fulfill the other constitutional requirement of a previous opportunity to talk to and confront the defendant and ask him questions. That never happened. He wasn't allowed. He wasn't permitted. Mr. Olatu was never permitted to even find out from Mr. Yamaguchi, have him testify as to what was happening. Counsel, if I could just jump in. This was introduced under Rule 803 where the witness's availability is not an issue, correct? That's correct to a certain extent, Your Honor, because it does come under medical diagnosis and treatment. However, if he had gone directly from that education room to the medical center for treatment, then that might be a reason, but he didn't. It was a delay, so we don't know when exactly those other injuries happened because it was evident on the video. I appreciate that. I think you were suggesting that the government didn't do enough to try to find the witness because you mentioned Oahu is a small island, but as I understand that rule of evidence, even if he were next door, the government would not have to call him. It's not 804. 804 requires the proponent to show the witness is unavailable, but this was 803, and so whether he's next door or on a different planet ultimately doesn't matter under that rule, correct? I disagree, Your Honor, because I think in Crawford that he stated that even if you have state rules like hearsay rules, there's still that constitutional burden there that the person not only has to be unavailable, and they use that if they have a dying declaration they're unavailable, but also the opportunity to be cross-examined or to have some information about what he said happened on a record, and that didn't happen, and that's outside of the 803 rule that you still have the Sixth Amendment demands, that the common law required unavailability and a prior opportunity to cross-examination, so you still have that right. Were those statements testimonial in nature? I say yes. The statements that the doctors said on the stand about what Yamaguchi said to them, though you were testimonial because it wasn't an ongoing emergency. If he had gone directly to medical after the incident in the education room, then it might have been an ongoing, but not almost two hours later, and we don't know what happened. And he said when he went to Dr. Chi or Nurse Chi, he said, I fell off the bus. Let me clarify your answer because the we don't know what happened seems to go to the sufficiency of the evidence argument, but just looking to the primary purpose test for purposes of your confrontation clause argument, how is this not an ongoing emergency given the severity of his injuries? Because it wasn't ongoing because he was fine, and it was almost two hours later that something else happened, and he told the doctors. How was he fine given the extent of the injuries? Well, we don't know what happened, but when he walked out of that room, when he walked out of that room and you can see he didn't have those injuries, the telephone call from the voice and there was no, when the doctor even said that the swelling starts immediately, your tongue swells and you have difficulty in speaking clearly. He spoke very clearly on that call an hour after the incident happened, and I think that is evidence to show that it wasn't an ongoing, it was a new emergency. Yes, if he fell off his bunk, that was an emergency, and he went immediately to medical, but there were no direct evidence other than the testimony. There were no written documents to prove the time he went there, but it was approximately 145 to 2, which was quite a long time after, so I don't think you consider that an ongoing emergency. I think it's more considered that it's testimony in preparation for this going to trial, and that is testimonial. It's not, and it's covered by the Confrontation Clause, that he should have had an opportunity to be questioned, and Mr. Latu should have had an opportunity to ask him those questions. What actually happened? When did it happen? When did he, did he actually fall off the bunk or not? Because the evidence doesn't show that, and the time delay can't compensate for being an ongoing emergency. I believe it was in the Davis case where her call to 911, where she was frantic and she was saying, you know, her husband was coming after her. That was considered non-testimonial because it was an ongoing emergency, but when she said later, oh, he's left the room, now it wasn't, because there was no danger to her at that time of continual being installed. So that part was testimonial. And I feel that the testimonies by these doctors, and Dr. Yost wasn't a treating physician. He was the one that did the, I guess you'd call the exit from the hospital. He wasn't treating, so his testimony about what was said was not relevant at all. But the testimony that the other doctors said, it was really testimonial in nature because it was preparing for future litigation. I'm sorry, I forgot to reserve time. Do you have any questions? You have three minutes that you can reserve. Okay. Thank you. Thank you, Your Honor. May it please the Court, Counsel, I'm Michael Namar for the United States. Good morning. I want to start with sufficiency of the evidence. Clearly here there was sufficient evidence that Mr. Latu caused serious bodily injury to Yamaguchi, who's the victim in this case. We submitted the video to Your Honor so Your Honor could review that video, and I think it's helpful when the Court's deciding whether there is sufficient evidence. Most notably, the injuries that the victim sustained in this case are consistent with what you can see on the video. At 1 minute and 40 seconds, Latu can be seen repeatedly striking the victim in the head and upper part of his body. That would be consistent with someone suffering a broken jaw and lacerations to the face, injuries the victim suffered. Then at 1 minute and 57 seconds, Latu can be seen stomping and kicking the victim who had fallen on the floor at that point. Again, that's also consistent with someone suffering broken ribs, injuries that the victim suffered. After the vicious beating, the victim is seen on the video barely able to walk with blood on his shirt at 3 minutes and 6 seconds. Again, that's consistent with injuries the victim suffered. At 1.45 p.m., some 90 minutes after this assault, the victim goes to get help from an officer. Then he's taken into the medical unit at the FTC Honolulu here. As for identification, two witnesses who testified they are familiar with Latu identified him as the person on the video striking the victim. In addition, the jury saw photographs of Mr. Latu's hands that were taken directly after the assault within hours, and those photographs showed swollen knuckles and redness on the knuckles. Photographs were also taken on the day of the assault so the jury could compare the way Mr. Latu looked to the person on the video. Yes, Mr. Yamaguchi, the victim, initially told Nurse Chi in the medical unit that he had fallen off the bed, but also in the record was that Nurse Chi pressed him on this because he didn't find it credible given the assaults, and that the victim later told Nurse Chi he was assaulted in the education room. Also in the record was Nurse Chi's medical opinion that he didn't think that the victim's injuries in this case were consistent with falling off the top bunk. So given this, I would submit that Mr. Latu cannot come anywhere close to prevailing on this argument. The court, as it knows, must respect the province of the jury to determine credibility, to resolve evidentiary conflicts, and draw inferences from proven facts assuming that the jury resolve all such matters in a manner which supports the verdict. As far as whether the victim in this case, whether there's sufficient evidence that he suffered serious bodily injury, I think without question there is. The record showed that he lost consciousness, the victim did, that he rated his pain an 8 out of 10, that he had a broken jaw with a bone protruding from it that required emergency surgery that day at the hospital, that he had four fractured ribs, which Dr. Yost told us would be very painful when you tried to breathe, that he was in the hospital for a span of seven days, that he had his jaw wired shut for weeks and he was restricted to a liquid diet. I think clearly given those things, he suffered serious bodily injury. And his injuries, they fall in line with other cases cited in our brief, or they were worse than the cases cited in our brief, like Alexander, where the victim was dizzy for days, had severe pain, and was hospitalized for two days. Or Frazier, from the Sixth Circuit, where there was a brief loss of consciousness, the victim rated their pain at 7 out of 10, and his eye was swollen for a week, which the court found was sufficient for protracted loss. Clearly here there was sufficient evidence to support the conviction. I want to turn now to the 8034 issue, whether the statements that the victim made to the medical professionals fell within the medical provider's rule. I think clearly they did here. Initially the victim told Nurse Chi at the BOP that he had fallen out of bed. Later he said he had been assaulted in the library and that his pain was an 8 out of 10. When he was transported, the victim was transported to the hospital, he saw Dr. Macino, who's the oral surgeon. The victim told Dr. Macino that he was assaulted, but that he didn't remember all the details because he lost consciousness and he wasn't exactly aware of what happened to him. Importantly, not at any point did the victim ever say, Latu is the person who assaulted me. Dr. Macino told the jury it's important to ask patients how they're injured so the treatment team knows the amount of force and so they don't miss injuries. And as for pain, Nurse Chi also explained to the jury that it's important to know the patient's level of discomfort so they can be treated properly. I think clearly the primary purposes of the statements to Nurse Chi and Dr. Macino were to get treatment, and the statements that were admitted were pertinent to that. They fall squarely within the rule. The statements admitted in this case were consistent with statements to medical providers that this circuit has addressed and other circuits have addressed. Most notably is the case we discussed in our brief, which is United States v. Kutsawa Teiwa, which is the Ninth Circuit case from 2018. What happened in that case was the nurse was examining a child and asked what happened to the child, and the child described the assault that she suffered. That was admitted under the rule. And I think also worthy of note is United States v. Earth, which is the Eighth Circuit case. In that case, it informs us that statements to medical professionals concerning the cause of injury, for example, I was assaulted, are usually admissible under the rule. Nor were any of these statements here testimonial, so they didn't violate the Confrontation Clause. I think clearly, given the record that we have here, there's no question that there was an ongoing emergency. He had emergency surgery the day that he was transported to the hospital here in Honolulu. The primary purpose of the statements discussed above were for medical treatment, not to develop evidence. The victim was seeking aid, which is indicative of the statements being non-testimonial. As mentioned in Ohio v. Clark, there's no indication in the record that the primary purpose of the conversation was to gather evidence for a prosecution or a disciplinary hearing. I think that the Fifth Circuit's decision in Santos is very helpful. We have extremely similar facts in that case. In that case, an inmate was beaten and stabbed in a federal prison, and he went to go, like in our case, to see the BOP nurse, and he made statements regarding being stabbed and his pain level. The Fifth Circuit found, in that case, that the statements made were pertinent to medical treatment and were not for the purpose of gathering evidence for a trial or some disciplinary proceeding. Availability is not an issue. I would point the court to Davis v. Washington, page 825. And what that basically instructs is the issue is really whether this is testimonial or not. If the court were to decide that this is not testimonial, then the availability issue is of no concern. Finally, if there were any error on this point, it was harmless because, number one, the evidence that the victim was assaulted was overwhelming, and, number two, the evidence was also overwhelming that the victim suffered significant pain. After all, the jury, for themselves, saw the vicious video in question. They heard from prison staff that took photos of Yamaguchi, that he looked like he was in significant pain. Your Honors can see those videos. His eyebrow is about the size of a golf ball in that particular photo. They also learned from Yamaguchi that he suffered four fractured ribs. Dr. Yost told the jury that, in his medical opinion, it's very painful to breathe when you have broken ribs. In addition, the jury learned that the victim was prescribed liquid oxycodone for pain, and they also heard that he spent seven days in the hospital. Clearly, Latu would have been convicted with or without the introduction of the out-of-court statements here. As for the jury instruction issue, just to hit that briefly, here we clearly had four different alternatives or four different avenues which describe serious bodily injury. As United States v. Nishi instructs, these alternatives are to be treated separately. Here, during the bench conference, the judge reviewed the four alternatives and went with the only two that applied. There was nothing improper about that, and the two alternatives shown were, number one, supported by the law, and number two, had foundation in the evidence. As this court is aware, to satisfy the plain error standard with the jury instruction, there needs to be a significant possibility that the jury might have acquitted if it had considered the matter. Clearly here, even if the jury were given the inapplicable alternatives, it wouldn't have mattered. In other words, they would have been no more likely to acquit Latu. There was no error on that issue, let alone plain. And finally, as for the sentence in this case, it was reasonable. The record is clear that the court considered the Section 3553A factors, many of which were seriously aggravating. I think the court summed it up best when it described Mr. Latu's offense as premeditated and that his criminal history was absolutely shocking. It was a shocking history, the district court said, for a man Latu's age. The district court elaborated that because of Mr. Latu's MMA fighter skills, Mr. Latu had the ability to cause great danger when he does things. It went on to explain that it had a real concern, based on the record before it, that Mr. Latu was going to get out and harm other people in our community. He also noted before imposing sentence that he rarely varied above the applicable guideline range. So clearly, the 96-point sentence given here was not substantively unreasonable. This is not, I would submit, one of those rare cases where the court could have a definite and firm conviction that the district court committed a clear error of judgment. Happy to answer any questions your honors have. All right. Thank you, counsel. Ms. Dodson, you have some three minutes. Thank you, your honor. The pictures that were taken of Yanaguchi and his swollen face and so forth, they weren't taken until 2.50 p.m. This happened, the assault happened about 12, finished about 12.18 p.m. So there was a long time difference. And if he had all that swelling that took place, it would have been evident, something would have been evident on that video, it wasn't. If he had broken his ribs and you didn't see him kick him in the back, and the way he was seated down on the floor, Mr. Yanaguchi, it wasn't where he could kick him were ribs. And if he had ribs, broken ribs, and I've had broken ribs, he would have gotten up and held his back because it hurts when you move immediately. And he didn't. He walked out. He didn't show any evidence of any of those injuries. And, again, the video, it doesn't show all the blood that the government talks about. It showed one little spot. And I'd like you to go back and look at that and pause it and see. Because Mr. Latu did not get that many punches in. He went in first and started hitting him. He was pulled back. Yamaguchi was on the floor. He wasn't close to him. And also the injury, she stated that the injury could have been sustained from a fall from a bug. And also Dr. Machino said that as well. And Dr. Machino said in any medical or dental examination, the first thing he asks is what is the chief complaint, not how it happened. They want to know what's wrong. Well, they could see his jaw. He went in there for his broken jaw. And his jaw, he only had about a month that he had any type of complaints about the jaw. When he went back, he kept going back. He had taken out his wires. And Dr. Machino finally said in a month, you're fine because your wires have been out. He'd been eating regularly. So how can that be actually a serious, under a serious violent felony? It wasn't. Yes, he did assault him, but it should be under bodily injury. And I think another thing that has to come into this issue, Fernandez was present when she was examining Yamaguchi. He was the officer that was there, and he photographed. He's the one that took the photographs. And he heard when Yamaguchi told she that he fell off the bunk, and that's how he got his injuries. Also something that's really important is the law has changed. This took place in 2016. The trial was in 2018. Borden was decided in 2021. The government didn't submit their brief until the end of 2021. During that time, Borden has stated that if there's recklessness involved, then it's not a violent felony. And if you look at Lotu's history, the majority of his assault twos, they wouldn't even count. The district court didn't find that he was a career offender, and the government at first appealed that and then dropped it after Borden. That's correct, but he was still sentenced based on that criminal history as being very violent. But if you look at it now, then it wouldn't even be considered that violent. And also in the argument that was made at the trial, at the sentencing hearing, they went on about how his injuries were from this video and from that assault. But if you look at the video, they didn't take place then. And again, there's too long of a time, Darren. So, yes, he should be convicted of bodily injury, but not the serious violence. And if you look at the sentencing guidelines, then he should have only gotten approximately, even if he was still at a level six, he should have only gotten like 21 to 28 months. He's been incarcerated since that date of 2016. He's completely served his state sentence. The state refused to parole him over to federal, even though the state court, at its last conviction, stated that his state sentence would be concurrent with federal. And he hasn't had any violations the whole time he's been incarcerated. And even the judge at sentencing said, yes, he's done some things between the time that it happened and the time of sentencing, but it's too little too late. But that's not the case because he was very young when these incidents happened. And the conviction was incorrect. The evidence did not support a serious violent injury. The video doesn't show it, the time delay, the telephone call. If it would happen and it was an ongoing emergency, he should have gone to medical immediately. He didn't. All right, counsel. Thank you. You're over your time limit. I'm sorry, Your Honor. Okay. Thank you very much. We appreciate your argument very much. The United States v. Lahtou will be submitted.
judges: WARDLAW, NGUYEN, OWENS